IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

**Alexandria Division**

| | | |
|---|---|---|
| **Abdul Grant,** | ) | |
|     **Plaintiff,** | ) | |
| | ) | |
| v. | ) | 1:21cv1164 (RDA/WEF) |
| | ) | |
| **Western Tidewater Regional Jail,** *et al.*, | ) | |
|     **Defendants.** | ) | |

## MEMORANDUM OPINION

Plaintiff Abdul Grant, a Virginia inmate proceeding *pro se*, filed a civil rights complaint pursuant to 42 U.S.C. § 1983, alleging that his Eighth Amendment rights were violated when Defendants, employees of the Western Tidewater Regional Jail ("WTRJ"), used excessive force to move him to a new cell and in walking him down a hallway a short time later. The complaint was screened, deficiencies noted, and Plaintiff filed an amended complaint on December 21, 2021 [Dkt. No. 11], which was served on the remaining Defendants: Lt. Col. Ernest Bower, Lt. Michael Ambrose, Lt. Bobby Brinkley, Lt. Joshua Humphrey, Off. Jonathan Lant, Lt. John Marx, Lt. Anthony Perry, and Off. Stanley Sagar. [Dkt. Nos. 15-22]. Plaintiff alleges that Defendants Humphrey, Perry, and Marx inflicted cruel and unusual punishment by using excessive force that resulted in an injury that required eight stitches. [Dkt. No. 11 at 5]. Plaintiff alleges that Defendant Bower is liable for the injury because he is "legally responsible for the operation and security of the [WTRJ]," and that the remaining Defendants were derelict in their duty to preserve Plaintiff's safety and security. [*Id.* at 5, 10].

Defendants have filed a motion for summary judgment, supported by exhibits, two videos, and affidavits. [Dkt. Nos. 24, 25, 25-1 through 5]. Plaintiff has been afforded the opportunity to file responsive materials pursuant to *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975) [Dkt. No.

57], and has filed a response and an affidavit. [Dkt. Nos. 30, 30-1]. Accordingly, this matter is now ripe for disposition. For the reasons that follow, Defendants' motion for summary judgment is granted.

## I. Undisputed Statement of Facts

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Defendants, pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56, set forth a statement of material facts that they contend are undisputed. Plaintiff has not complied with his obligations under those Rules by submitting statements of undisputed and disputed facts.[1] Accordingly, the undisputed facts set forth below are based upon the video evidence, which Plaintiff did not object to, and the undisputed portions of the exhibits submitted in support of the motion for summary judgment.[2]

1. At all relevant times, Plaintiff, a convicted felon, was incarcerated at WTRJ.

2. At all relevant times, Defendants were employed by the WTRJ.

---

[1] For example, Defendants aver that Plaintiff was loud, aggressive, and shouting obscenities in dealing with the officers during the cell extraction and also when he tried to pull away from Defendant Humphrey during his transport to the booking area. *See* Dkt. No. 25-2 at 9, 114, 6, 17. Plaintiff did not dispute these assertions of fact in his affidavit. *See Integrated Direct Mktg., LLC v. May*, 129 F. Supp. 3d 336, 345 (E.D. Va. 2015) ("In determining a motion for summary judgment, the Court may assume that facts identified by the moving party in its listing of material facts are admitted, unless such a fact is controverted in the statement of genuine facts in opposition to the motion" (quoting E.D. Va. Loc. Civ. R. 56(B))), *aff'd*, 690 F. App'x 822 (4th Cir. 2017); *see also JDS Uniphase Corp. v. Jennings*, 473 F. Supp. 2d 705, 707 (E.D. Va. 2007) (movant's statement of undisputed facts is deemed admitted where nonmovant's response fails to "identify with any specificity which facts, if any, were disputed" (citing E.D. Va. Loc. Civ. R. 56(B))). Although there is no audio, the video of the incident corroborates the assertions that Plaintiff was uncooperative during the extraction and the transport to the booking area by moving aggressively toward officers, trying to pull away from officers.

[2] The record of admissible evidence includes defendants' affidavits and exhibits. [Dkt. Nos. 30-1 through 5]. Neither the original complaint nor the amended complaint were verified, and Plaintiff submitted an affidavit in support of his opposition to the motion for summary judgment. Defendants submitted two videos (no audio) of the incident [Dkt. Nos. 30-4 and 30-5] and three pictures of Plaintiff's injury. [Dkt. No. 37-2]. On July 28, 2022, Plaintiff was provided approximately one hour to review the videos (each video is approximately six minutes long) [Dkt. No. 33], and he has not disputed the accuracy of the videos.

3. On August 4, 2021, WTRJ intended to move Plaintiff from his cell on the second floor of housing unit A4, to a nearby cell. [Dkt. No. 30-1 at 1].

4. Plaintiff was notified of the move and refused multiple orders to pack his belongings for the move. [Dkt. No. 25-2 at 6, 17].[3] Instead of complying, Plaintiff tried to convince correctional officers, including Defendants Humphrey and Perry, not to move him. [Dkt. Nos. 11 at 8, 9].

### A. Cell Extraction

5. Due to Plaintiff's repeated refusals to pack up to be moved, WTRJ officers prepared for a cell extraction. The participating officers included Defendants Perry, Brinkley, Sagar, Lant, Ambrose, Marx, and Humphrey. Ambrose and Lant were members of the Emergency Response Team (ERT) and were authorized to use pepper ball launchers. [Dkt. Nos. 25-1 at 3; 25-2 at 1, 11].

6. At approximately 3:20 p.m., while still trying to convince officers not to move him, Defendant Humphrey told Plaintiff to "cuff up." Plaintiff was handcuffed without incident or the need to deploy a pepper ball, and was moved away from his cell while Defendant Brinkley entered to pack up his belongings.[4] (Video 1 at 3:20:09 through 3:20:52).

7. Plaintiff stood in the hallway outside of the cell with five officers while Brinkley removed Plaintiff's belongings from the cell and placed them on the floor next to where Plaintiff

---

[3] In his affidavit, Plaintiff admits he knew he was to be moved, that he did not want to move, and that he continued to try and "talk" his way out of the move even after the extraction team was assembled; and that he was "exchanging words" with Defendant Perry while Defendant Brinkley packed up his belongings. [Dkt. No. 30-1 at 1, 2].

[4] "In *Scott v. Harris*, 550 U.S. 372 (2007), the Supreme Court held that, when 'opposing parties tell two different stories, one of which is blatantly contradicted' by video evidence contained in the record, 'so that no reasonable jury could believe it, a court should not adopt that version of the facts . . . .' *Id.* at 380. Rather than relying on 'visible fiction' propounded by the party whose account is contradicted by the video evidence, a court should 'view[ ] the facts in the light depicted by the videotape.' *Id.* at 381." *Sawyer v. Asbury*, 537 F. App'x 283, 291 (4th Cir. 2013). In the instant case, there are two videos, without audio, of the August 4, 2021 incident at WTRJ. Although grainy, the viewer allows for magnification that assists in determining that in each instance Plaintiff was not tackled, slammed to the floor, or treated in any like manner. The viewer for the videos has a magnification function and a frame-by-frame function, which can be used together to view the pertinent portions of the video.

3

was standing with five of the other officers. Two officers (Humphrey and Perry) were next to Plaintiff and Plaintiff was facing a cell with his back to the offices. Three other officers were in a small semi-circle around them, and another officer (Ambrose) was several steps down from the second floor on the stairs. [Dkt. No. 25-2 at 2]; (Video 1 at 3:20:54 through 3:22:50).

8. After Brinkley had been removing items from the cell for slightly under two minutes, Plaintiff turned to look over his left shoulder, and then returned to a position with his back facing the officers. (Video 1 3:22:50).[5] Brinkley discovered a "shank" in the belongings removed and Plaintiff became "loud and aggressive" "irate and tried to push past the officers." [Dkt. No. 25-1 at 3, 7, 9, 11].

9. A few seconds later, Plaintiff abruptly turned a second time toward the officers, forcing them back slightly and the officers contained Plaintiff against the wall. (Video 1 3:22:55-58). Plaintiff then lunged[6] forward against two officers, Plaintiff's knees buckled, he appears to lose his balance, and the officers lowered him to a seated position on the floor. (Video 1 3:23:01-05). The officers block the view of Plaintiff and two officers (one of whom was Humphrey) that lowered him to the floor for the next thirty seconds, and when the officers move back, the video shows Plaintiff still in a seated position leaning against the wall. (Video 1 3:23:37) [Dkt. No. 25-1 at 7]. Approximately twenty-five seconds later, the officers assisted Plaintiff to his feet. Plaintiff was able to walk under his own power and he and the officers begin walking toward the stairs. (Video 1 3:24:01-07).

---

[5] Plaintiff avers in his affidavit that he turned to address Defendant Perry, and that Perry choked him for a few seconds before Perry and Defendant Sagar took him "to the ground." [Dkt. No. 30-1 at 2]. The video does not show that any officer choked Plaintiff before he went to the floor. (Video 1 at 3:22:50 through 3:23:04).

[6] Plaintiff avers that he never "attempted to charge" at Perry. [Dkt. No. 30-1 at 2]. The video, however, does show that Plaintiff's conduct is appropriately deemed an attempt to lunge at or push past the officers.

4

10. The housing unit became chaotic during the cell extraction. Other inmates had been making comments that caused Plaintiff to become more and more agitated, and Defendant Humphrey decided to take Plaintiff to Booking to give him a chance to calm down. [Dkt. No. 25-2 at 8-9]. Defendant Humphrey held Plaintiff's left arm as they walked down the stairs. At the bottom of the stairs, Defendant Humphrey, still holding Plaintiff's left arm, placed his right hand on Plaintiff's right shoulder blade area as they move out of view. (Video 1 3:23:07-20).

11. Defendant Ambrose was half-way down the stairs from where Plaintiff was at this time, and another officer lowered Plaintiff to the floor and did not see what occurred between Plaintiff and the officers on the platform area outside of Plaintiff's cell and at the top of the stairs. [Dkt. No. 25-2 at 2].[7]

12. Defendant Bower was not present, and was in his office in a different area of the jail at the time of the cell extraction. [*Id.* at 4].

13. Defendant Brinkley was in Plaintiff's cell packing up his belongings when he heard the commotion outside of the cell but did not see what occurred. [*Id.* at 6-7].

14. Defendant Marx was in the area outside of Plaintiff's cell while Brinkley was packing up Plaintiff's belongings, but he did not participate in the interaction between Plaintiff and the other officers that resulted in Plaintiff going to the floor. [*Id.* at 13].

15. Defendant Sagar was present outside the cell and observed Plaintiff "lunge" at Perry and lose his balance and other officers catch him and lower him to the floor. [*Id.* at 17].

---

[7] Defendant Lant avers that he was on the stairs with Defendant Ambrose. [Dkt. No. 25-2 at 11]. The video of the extraction indicates only one officer was on the stairs, and that officer's appearance and use of the pepper ball gun is consistent with Defendant Ambrose's affidavit. For purposes of this motion, the Court deems Lant to be one of the officers on the floor, but consistent with his affidavit, he was not involved with restraining Plaintiff.

*B. Walk to Booking*

16. Defendant Humphrey escorted Plaintiff using a two-point contact, with one hand on his left arm and the other hand on his right shoulder. Defendant Sagar walked with them. The video shows that Humphrey and Plaintiff left the housing area at 3:24:20 p.m. and the second video shows they entered the hallway seven seconds later at 3:24:27 p.m. (Video 2 at 3:24:27). There are two correctional officers in the hallway at the time they entered who appear to be involved in removing a bag of garbage; there was also a woman in a white coat walking down the hallway away from where Plaintiff was entering the hallway. (Video 2 at 3:24:27-30).

17. Plaintiff entered the hallway to the booking area through an open door at 3:24:30 p.m. (Video 2 at 3:24:30). Shortly after entering the hallway, Plaintiff attempted to pull away from Defendant Humphrey's grip on his arm. (Video 2 at 3:24:32). The video shows that Plaintiff swung his left arm toward Humphrey's head in an attempt to free his left arm from Humphrey's grasp. (Video 2 at 3:24:30-32).

18. Plaintiff was pushed up against the wall and then lowered to the floor by two officers, one on either side of him. (Video 2 at 3:24:34). The two correctional officers in the hallway when Plaintiff entered stood to the side and were not involved with lowering Plaintiff to the floor. The woman in the white coat ran down the hallway away from Plaintiff and the correctional officers and entered an office down the hallway. (Video 2 at 3:24:32-37).

19. Plaintiff was seated at this point, with his back to the wall, and his forehead did not come into contact with the floor or the wall. Once on the floor, Humphrey and another officer "rolled" Plaintiff over onto his stomach because Plaintiff was being "combative and [was] resisting attempts to control him." [Dkt. No. 25-2 at 9] (Video 2 at 3:24:35-42). Officer Sagar assisted by restraining Plaintiff's legs. [Dkt. No. 25-2 at 18]. The video shows no contact between Plaintiff's

6

head and the wall.[8] Simultaneously, several other jail personnel entered the hallway from the housing area and the rooms along the hallway in response to the commotion, but none of these individuals were involved in any application of force to Plaintiff.

20. After Plaintiff was on his stomach, with the exception of Humphrey who was restraining Plaintiff, the other correctional officers moved away. (Video 2 at 3:24:42-45). Humphrey straddled Plaintiff's lower back and placed his hands on Plaintiff's upper back just below Plaintiff's neck. (Video 2 at 3:24:45). Marx had followed behind Humphrey and Plaintiff as they walked toward the booking area and observed Plaintiff make an "aggressive move, pulling away and trying to swing at Lt. Humphrey." [Dkt. No. 25-2 at 14]. Plaintiff was continuing to resist, ignoring direct orders, and using obscenities, and Defendant Marx used a ½ second spray of O.C. gas directed at Plaintiff's facial area in an effort to gain compliance and then stepped back. [*Id.*].[9] The spray was administered at approximately 3:24:45 p.m., and also hit Humphrey in the facial area. [Dkt. No. 25-2 at 9]. Humphrey released control to other officers and went to rinse his eyes out. [*Id.*] (Video 2 at 3:25:05).

21. Defendant Perry returned to assist and stood over top of Plaintiff but was not in physical contact with Plaintiff. (*Id.*). After a few seconds, Plaintiff lifted his head and then returned it to the floor. (Video 2 at 3:25:02-03). Perry responded by dropping to the floor and trying to keep Plaintiff's head immobile. Despite his efforts, Plaintiff again lifted his head from the floor and struck his head against the wall, at least twice. (Video 2 at 3:25:03-10; 3:25:17-18).[10] Perry also

---

[8] Using the magnification and frame -by-frame features of the video reviewer, the video shows space between Plaintiff's head and the wall.

[9] OC spray is a chemical agent similar to what is commonly known as pepper spray or mace and irritates a person's eyes, throat, and nose. *See, e.g., Park v. Shiflett*, 250 F.3d 843, 849 (describing the physiological effects of OC spray).

[10] In his affidavit, Plaintiff denies that he ever "banged" his head against the floor or wall. [Dkt. No. 30-1 at 3]. Plaintiff avers that his injury occurred when Humphrey "took [him] to the ground." [*Id.*]. The video, however, shows that Plaintiff's head never touched the wall or floor as a result of Humphrey's reaction to Plaintiff swinging his

avers that Plaintiff was "drag[ging] his head along the wall" as well as "harming himself." [Dkt. No. 25-2 at 16]. The incident reports indicate that Plaintiff's banging his head against the wall shortly after Defendant Marx used the O.C. spray. [*Id.* at 9].

22. Approximately one minute after the O.C. spray was deployed, two correctional officers (Perry and Brinkley) stood Plaintiff up, walked him down the hallway, and turned to go to the medical unit. (Video 2 at 3:26:10-20). After evaluation, Plaintiff was taken to the booking area for decontamination to rinse his eyes. [Dkt. Nos. 25-1 at 3, 11; 30-1 at 3].

23. Defendant Ambrose was not present in the hallway until after Plaintiff was on the floor and did not see the O.C. spray deployed. [Dkt. No. 25-2 at 2].

24. Defendant Bower was in his office at the time of the commotion in the hallway, and when he entered the hallway Plaintiff was already on the floor and was "resisting the officers and being combative." [*Id.* at 4-5]. Defendant Bower did not see the O.C. deployed or Plaintiff hit his head on the wall. [*Id.*]. After Plaintiff was up on his feet and brought to medical, Bower returned to his office. [*Id.* at 5].

25. Defendant Brinkley was still in the housing area and was not in the hallway when Plaintiff was lowered to the floor. Brinkley responded to the commotion and saw Plaintiff on the floor resisting other correctional officers. Brinkley did not see the O.C. deployed and assisted in escorting Plaintiff to medical so he could be decontaminated. [*Id.* at 7].

26. Defendant Lant was in the housing area and did not leave after the extraction. [*Id.* at 12].

---

arm. Humphrey lowered Plaintiff to the floor in a seated position and Plaintiff's head did not contact the floor or the wall. The video also shows Plaintiff, of his own volition, move his head up and down before the O.C. is deployed. *See, supra* at note 4 (discussing video evidence).

27.     Plaintiff's medical records establish that he was seen at 4:16 p.m. on August 4, 2021. The examination determined that Plaintiff had a 3.5-inch laceration above his right eye and bruising on his back, neck, and shoulder areas. Plaintiff denied that he had any "visual disturbance" or loss of consciousness. The medical notes indicated that Plaintiff had a previous injury to the area above his right eye. The examining medical person indicated he was "PERRLA," which is an acronym that means his pupils were equal and round and reactive to light and accommodation. He was scheduled to see a doctor that evening for stitches and placed on "medical lockdown" for 72 hours in case he had a concussion. [Dkt. Nos. 25-5 at 1-2; 30-1 at 3]. Plaintiff's laceration was closed with eight stitches, which were removed on August 12, 2021. The medical notes indicate that there was no sign of infection and that the laceration had "healed." [Dkt. No. 25-5 at 1-2].

## II. Standard of Review

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of proving that judgment on the pleadings is appropriate, *i.e.*, that no genuine issues of material fact are present for resolution. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The facts which a moving party bears the burden of proving are those which are material: materiality is dictated by "the substantive law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Once a moving party has met its burden of proof, the non-moving party must produce specific facts to generate a disputed issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The court will view the evidence and draw all reasonable inferences in the light most favorable to the non-moving party. *Porter v. U.S. Alumoweld Co.*, 125

F.3d 243, 245 (4th Cir. 1997). Nevertheless, "[o]nly disputes over facts which might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248.

The non-moving party may not defeat a properly supported summary judgment motion by simply substituting the "conclusory allegations of the complaint or answer with conclusory allegations of an affidavit." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990). This applies even where the non-moving party is a *pro se* prisoner. *Campbell-El v. Dist. of Columbia*, 874 F. Supp. 403, 406-07 (D.C. 1994); *see also* Local Civil Rule 7(K)(3) (providing that, to defeat a dispositive motion, a *pro se* party "must identify all facts stated by the moving party with which the *pro se* party disagrees and must set forth the *pro se* party's version of the facts by offering affidavits . . . or by filing sworn statements"); *Ash v. United Parcel Serv., Inc.*, 800 F.2d 409, 411-12 (4th Cir. 1986). Similarly, "[t]he mere existence of some alleged factual dispute" cannot defeat a motion for summary judgment; the dispute must be both "material" and "genuine," meaning that it "might affect the outcome of the suit under the governing law." *Hooven-Lewis v. Caldera*, 249 F.3d 259, 265 (4th Cir. 2001) (emphasis omitted).

### III. Excessive Use of Force

The Eighth Amendment proscribes "the unnecessary and wanton infliction of pain." *Hudson v. McMillian*, 503 U.S. 1, 5 (1992); *Thompson v. Commonwealth*, 878 F.3d 89, 97 (4th Cir. 2017) (quoting *Estelle v. Gamble*, 429 U.S. 97, 102 (1976)). The prisoner must prove that, subjectively, the official acted "maliciously and sadistically for the very purpose of causing harm" rather than "in a good faith effort to maintain or restore discipline," *Whitley*, 475 U.S. at 320-21 (internal quotation marks and citations omitted), but not every malevolent touch by a prison guard gives rise to an excessive force claim. *Hudson*, 503 U.S. at 9 (1992); *Wilkins v. Gaddy*, 559 U.S.

34, 38 (2010) ("An inmate who complains of a 'push or shove' that causes no discernible injury almost certainly fails to state a valid [Eighth Amendment] excessive force claim."). Factors relevant to proving malicious or sadistic intent include: (1) the need for force; (2) the degree of force used in relation to the need for force; (3) the existence of a threat reasonably perceived by the official; (4) any efforts made to lessen the severity of a forceful response; and (5) the extent of the prisoner's injury. *Id.* at 7.

Courts recognize that corrections officials must act "in haste, under pressure, and frequently without the luxury of a second chance." *Whitley v. Albers*, 475 U.S. 312, 320 (1986). Consequently, the Court must give prison officials "wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Hudson*, 503 U.S. at 7.[11]

> [D]eference extends to a prison security measure taken in response to an actual confrontation with riotous inmates, just as it does to prophylactic or preventive measures intended to reduce the incidence of these or any other breaches of prison discipline. It does not insulate from review actions taken in bad faith and for no legitimate purpose, but it requires that neither judge nor jury freely substitute their judgment for that of officials who have made a considered choice. Accordingly, in ruling on a motion for a directed verdict in a case such as this, courts must determine whether the evidence goes beyond a mere dispute over the reasonableness of a particular use of force or the existence of arguably superior alternatives. Unless it appears that the evidence, viewed in the light most favorable to the plaintiff, will support a reliable inference of wantonness in the infliction of pain under the standard we have described, the case should not go to the jury.

*Whitley*, 475 U.S. at 322.

---

[11] A court must also account for the "legitimate interests that stem from [the government's] need to manage the facility in which the individual is detained," appropriately deferring to "policies and practices that in th[e] judgment" of jail officials "are needed to preserve internal order and discipline and maintain institutional security." *Bell v. Wolfish*, 441 U.S. 520, 540 (1979). The Fourth Circuit has noted that federal courts "must accord due deference to an officer's efforts" to restrain a detainee "either to calm the general environment or to prevent [the detainee] from hurting himself" in order to not "encourage[] . . . insubordination in an environment which is already volatile enough." *Grayson v. Peed*, 195 F.3d 692, 697 (4th Cir.1999).

Here, there were two separate incidents which form the bases of Plaintiff's complaint. The first incident was the cell extraction and the second incident occurred shortly thereafter in the hallway enroute to the booking area. In each instance, the video clearly shows that Plaintiff was the cause of the escalation of force. The extraction team was assembled after Plaintiff failed to pack his belongings as he had been ordered to do and prolonged by his repeated statements that he did not want to move. Plaintiff's resistance was such that he had to be placed in handcuffs to facilitate the move. It is without question that force was needed to move Plaintiff to his new cell assignment because he failed to follow orders and pack his belongings and because he was "loud and aggressive" and "irate and tried to push past the officers." [Dkt. No. 25-1 at 3, 7, 9, 11].[12] The first incident caused a significant disruption in the housing area and a few of the officers escorted Plaintiff from the housing unit to the booking area to allow the unit to calm down.[13]

The video establishes that the officers did not act in a malicious or sadistic manner as evidenced by the way in which Plaintiff was lowered to the floor in each instance. The officers sought to slow Plaintiff's body as he fell during the cell extraction, and again in the hallway by bracing Plaintiff against the wall and then lowering him to the floor with his back against the wall and his buttocks making the first contact with the floor. *See Santiago v. Blair*, 707 F.3d 984, 990 (8th Cir. 2013) (noting that the "core judicial inquiry is 'whether force was applied in a good-faith

---

[12] Plaintiff denies that he lunged at the officers, but he has not disputed that he was loud, aggressive, or that he moved towards the officers. All of which followed the discovery of a shank in his cell as Brinkley packed his belongings.

[13] Plaintiff is pursuing a theory of bystander liability for several of the Defendants. "Under the theory of bystander liability, an officer may be liable only if such officer: "(1) knows that a fellow officer is violating an individual's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act." *Randall v. Prince George's County*, 302 F.3d 188, 204 (4th Cir. 2002) (footnote omitted). Bystander liability is predicated on the unconstitutional conduct of other officers, *see Thomas v. Holly*, 533 F. App'x 208, 221 (4th Cir. 2013), and only three of the Defendants actually employed force during the cell extraction and the hallway incident— Defendants Perry, Humphrey, and Marx. Because the Court has determined that there was no constitutionally impermissible use of force, the remaining defendants (Bower, Ambrose, Brinkley, Lant, and Sagar) are also not liable based upon Plaintiff's bystander liability theory. Indeed, several of them were either not present or in no position to intervene.

12

effort to maintain or restore discipline, or maliciously and sadistically to cause harm.'"). The video refutes Plaintiff's allegation that Humphrey "in one motion grabbed [him and] threw [him] to the ground with excessive force, slamming [his] head down into the concrete floor splitting [his] face." [Dkt. No. 11 at 9].[14]

In addition, there is no evidence that the decision to extract Plaintiff from the cell was made "maliciously," "sadistically," or to "cause harm." *Santiago*, 707 F.3d at 990. Under the first factor, force was necessary to restore order. *See Danley v. Allen*, 540 F.3d 1298, 1307 (11th Cir. 2008) ("[P]rison guards do not have the luxury or obligation to convince every inmate that their orders are reasonable and well-thought out. Certainly they are not required to do so where an inmate repeatedly fails to follow those orders."). Further, Plaintiff's bruises were incidental to the use of force that was necessitated by his refusal to follow orders and his attempt during the extraction and in the hallway to physically resist the officers. Finally, the laceration to Plaintiff's forehead was not the result of Defendant Humphrey slamming his head on the floor.

In addition, Defendant Marx's use of a one-half second spray of O.C. gas to help gain control of Plaintiff was reasonably related to the officers' efforts to restore order with minimal force. *See, e.g.*, *Danley*, 540 F.3d at 1307 (holding in context of pretrial detainee's excessive force claim that the use of "pepper spray is an accepted non-lethal means of controlling unruly inmates" and that "[a] short burst of pepper spray is not disproportionate to the need to control an inmate who has failed to obey a jailer's orders"); *see also Soto v. Dickey*, 744 F.2d 1260, 1270-

---

[14] Plaintiff's affidavit has distanced himself from his allegations in his amended complaint that he was slammed into the concrete. The affidavit simply states that Humphrey grabbed him "and took [him] to the ground," and that is when Plaintiff "received the injury above his right eye." [Dkt. No. 30-1 at 3]. To be sure, Plaintiff's affidavit is consistent with Humphrey's affidavit in which he described pulling Plaintiff to the wall and then lowering him to the floor. [Dkt. No. 25-2 at 9]. And, as noted, Humphrey's affidavit is consistent with the video. There was no slamming Plaintiff in the hallway or in the housing area. Plaintiff's affidavit disavows his own allegations in the amended complaint.

71 (7th Cir. 1984) (upholding the use of mace in a prisoner's cell because he refused to be handcuffed).[15] Plaintiff had repeatedly refused to comply with appropriate orders, he had attempted to push past or lunge at the officers outside his cell, a shank was found in his cell, Plaintiff attempted to assault Defendant Humphrey in the hallway, and Plaintiff continued to physically resist the officers after he had been lowered to the floor. To be sure, Defendant Marx's actions were consistent with the Fourth Circuit's observation that the use of non-lethal force, such as mace, "can be constitutionally used in small quantities to 'prevent riots and escapes' or to control a 'recalcitrant inmate.'" *Williams v. Benjamin*, 77 F.3d 756, 763 (4th Cir. 1996) (citation omitted); *Vinyard v. Wilson*, 311 F.3d 1340, 1348 (11th Cir. 2002) ("pepper spray is a very reasonable alternative to escalating a physical struggle with an arrestee."). Plaintiff was clearly recalcitrant. Further, after Plaintiff calmed down, he was immediately taken to the medical unit for evaluation and then to the booking area to decontaminate and rinse the pepper spray from his eyes.

The video also contradicts Plaintiff's version of each incident and shows that Plaintiff knocked his head against the floor on at least one occasion during the hallway incident and that he also intentionally caused his head to contact the wall as well. In short, under all five factors set out in *Hudson*, the evidence supports Defendants' use of force. "Correctional officers do not have to be under physical attack to justify the use of force; they can also use appropriate force 'to preserve

---

[15] *See, e.g.*, *Jones v. Shields*, 207 F.3d 491, 496 (8th Cir. 2000) (limited application of a chemical agent "to control a recalcitrant inmate constitutes a 'tempered response by prison officials' when compared to other forms of force."); *see also Dye v. Lomen*, 40 F. App'x 993, 996 (7th Cir. 2002) (prisoner who was tasered by guards after struggling and refusing instructions was not subject to excessive force); *Alana v. Rose*, No. 7:18cv00420, 2020 WL 3050236, * at 4-6 (W.D. Va. June 8, 2020) (defendant fired six non-lethal "impact rounds" containing OC spray to break up a fight between inmates); *Saunders v. Shaw*, No. 3:15cv82, 2015 WL 6693744, *5-8 (E.D. Va. Oct. 28, 2015) (use of pepper spray during cell extraction was a minimal use of force that allowed inmate to be placed in restraints); *Canada v. Fannin*, No. 7:10cv00432, 2011 WL 3880951, *2-3 (W.D. Va. Sept. 1, 2011) (use of rubber bullets to quell inmate altercation was a "good-faith effort to restore prison discipline [and] is not force that exceeds that allowed by the Eighth Amendment"), *aff'd*, 465 F. App'x 269 (4th Cir. 2012).

internal order by compelling compliance with prison rules and procedures.'" *Shiheed v. Harding*, 802 F. App'x 765, (4th Cir. 2020) (quoting *Brooks v. Johnson*, 924 F.3d 104, 113 (4th Cir. 2019)).

Because Defendants' motion for summary judgment will be granted for the reasons stated herein, their other arguments do not need to be considered.

### IV. Conclusion

For the reasons outlined above, Defendants' motion for summary judgment [Dkt. No. 24] will be granted. An appropriate order shall issue alongside of this Memorandum Opinion.

It is SO ORDERED.

Alexandria, Virginia
January 17, 2023

/s/
Rossie D. Alston, Jr.
United States District Judge